**EPSTEIN BECKER & GREEN, P.C.**
Kenneth J. Kelly (KK-4195)
Aime Dempsey (AD-3104)
Jennifer M. Horowitz (JH-3173)
250 Park Avenue
New York, New York 10177-0077
(212) 351-4500
Attorneys for Defendant
  McCann-Erickson, Inc.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x
BETH LAMBERT,                                         :
                              Plaintiff,              :
                                                      :
            - against -                               :    05 CIV. 9825 (RJH)
                                                      :
MCCANN ERICKSON,                                      :    **RULE 56.1**
a division of THE INTERPUBLIC GROUP, INC.,            :    **STATEMENT OF**
                                                      :    **UNDISPUTED**
                              Defendant.              :    **MATERIAL FACTS**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - X

        Defendant McCann-Erickson, Inc. ("McCann"), by its attorneys, Epstein Becker

& Green, P.C., pursuant to Local Civil Rule 56.1 of the United States District Court, Southern

District of New York, hereby submits the following statement of material facts as to which there

is no genuine issue to be tried.

## Background

        1.      McCann is a large global advertising agency that employs thousands of

people and engages in the business of creating and executing advertisements and advertisement

campaigns, in all media, for its clients. (Mars Aff., ¶1.)

        2.      On or about October 30, 2000, McCann hired Beth Lambert as a Senior

Art Director in its Creative Department. (Mars Aff., ¶7, Ex. A.)

NY:1520924v1

3.      Ms. Lambert was an at-will employee. (Mars Aff., ¶7.)

4.      Sallie Mars, Senior Vice President and Director of Creative Services, and Joyce Thomas, Chief Creative Officer, terminated Ms. Lambert's employment at a meeting among the three of them on March 4, 2005. (Mars Aff., Ex. F.)

5.      Ms. Mars and Ms. Thomas told Ms. Lambert that her employment was terminated because of her deficient performance and inappropriate behavior. (Mars Aff., ¶25, Ex. F.)

6.      Based on Ms. Lambert's deposition testimony, she was approximately 8-10 weeks pregnant at the time McCann terminated her employment. (Lambert Aug. 3 Dep. at 108:11-15.)

7.      Ms. Lambert had not told Ms. Mars and Ms. Thomas of her pregnancy prior to the March 4, 2005 termination meeting.  (Lambert Aug. 3 Dep. at 133:2-135:23; Mars Aff., Ex. F; Thomas Dep. at 141:8-10.)

8.      Neither Ms. Mars nor Ms. Thomas knew of Ms. Lambert's pregnancy when they informed her of their decision to terminate her employment. (Lambert Aug. 3 Dep. at 133:2-135:23; Thomas Dep. at 141:8-10; Mars Aff., Ex. F.)

9.      Ms. Lambert does not have any knowledge that anyone told Ms. Mars or Ms. Thomas of  her pregnancy.  (Lambert Aug. 3 Dep. at 133:2-135:23; 166:8-22; 167:11-19; 168:10-169:4.)

### Ms. Lambert's Employment with McCann

10.     At the time of her termination, Ms. Lambert held the position of a creative director. (Mars Aff., ¶7.)

11.    As a creative director with an art director background, Ms. Lambert, in collaboration with a copywriter partner (together referred to as a "creative team"), was responsible for developing and implementing original and effective advertising campaigns for her clients, based on an in-depth understanding of the clients' products, needs, and objectives. (Mars Aff., ¶8.)

12.    McCann values strong conceptual thinkers who can consistently generate creative, original ideas to address its clients' needs. (Mars Aff., ¶9.)

13.    After a creative team has created and designed an advertising idea and or written a script for a television commercial that the client approves, the team works with a McCann producer in finding the appropriate location, director, cast and props for filming of the commercial, called a "shoot." (Mars Aff., ¶10.)

14.    An indispensable attribute of a talented and valuable creative director is an ability to work well on a team. (Mars Aff., ¶10.)

### Ms. Lambert's Performance Deficiencies

15.    Ms Lambert's supervisors believed that Ms. Lambert's conceptual skills, at times, were lacking, and that she was not a team player.    (Mars Aff., ¶¶13-16, Exs. B, C, D and E; Oberlander Dep. at 54:8-11; 70:22-71:4; Mars Dep. at 40:23-41:8; 55:7-11; Thomas Dep. at 46:16-42:2.)

16.    McCann's records establish that it considered terminating Ms. Lambert's employment at times during 2003 and 2004 because of her deficient performance and inability to work effectively with other McCann employees – long before Ms. Lambert became pregnant. (Mars Aff., Exs. B, C and D.)

**A.      Ms. Lambert's Deficient Conceptual Skills**

17.      On October 15, 2004, before Ms. Lambert learned she was pregnant, Steven Ohler, then the Executive Group Creative Director with supervisory responsibility over Ms. Lambert, and Ms. Mars, prepared a written corrective action memorandum regarding Ms. Lambert's deficient performance. (Mars Aff., ¶13, Ex. B.)

18.      The memorandum states "We are restructuring the creative department and looking at every individual's contribution to the agency. The level of contribution of every member of the creative department has to be above and beyond what is expected." (Mars Aff., Ex. B.)

19.      It further states: "We have reviewed Beth [Lambert's] work on several occasions and it is not of the caliber we expect from someone at her level." (Mars Aff., Ex. B.)

20.      With respect to Ms. Lambert's work on the Verizon Wireless account, the memorandum states "The Verizon Wireless was felt to be 'very ordinary' by the client. We were asked to put a new team on the assignment." (Mars Aff., Ex. B.)

21.      In the advertising business, very ordinary work is unacceptable. (Mars Aff., ¶14.)

22.      The Verizon Wireless client perceived Ms. Lambert's work as "flat." (Lambert Aug. 3 Dep. at 186:20-24; Horowitz Aff., Ex. Y.)

23.      The memorandum states "given the past 5 years, a 30 day period of turn around will be insufficient to change our opinion of Beth [Lambert]." (Mars Aff., Ex. B.)

24.      The memorandum also states "We don't believe there is room for growth." (Mars Aff., Ex. B.)

25.    In addition to the corrective action memorandum, McCann's September 14 and 15, 2004 e-mail records establish that it considered terminating Ms. Lambert's employment in September 2004 – before she became pregnant – for poor performance. (Mars Aff., Exs. C and D.)

### B. Ms. Lambert Was Not a Team Player

26.    From approximately 2003 through the Summer of 2004, Ms. Lambert worked primarily for the Kohl's account, and reported to Group Creative Directors Karen Abbate and Jagdish Prabhu. (Mars Aff., ¶17.)

27.    A significant issue that arose while Ms. Lambert was working on the Kohl's account was her inability to work effectively with McCann's producers. (Mars Aff., ¶18, Ex. E; Lambert Aug. 3 Dep. at 73:4-11, 23-25; 74:2-25; 76:3-5.)

28.    As set forth in a July 22, 2003 e-mail, Peter Friedman, Executive Vice President and Director of Broadcast Production, complained to Ms. Mars that Ms. Lambert was "not a team player," and that "she treats the producers like they are her lackeys and does not welcome their input on production details." (Mars Aff., Ex. E.)

29.    The e-mail states that Mr. Friedman described an incident to Ms. Mars reported to him by his staff where Ms. Lambert demanded that the producer have an elliptical trainer brought to her hotel room while on a shoot, and went "nuts" when the hotel would not pay for it. (Mars Aff., ¶18, Ex. E.)

30.    Mr. Ohler and Ms. Mars reprimanded Ms. Lambert for her inappropriate behavior. (Mars Aff., ¶19; Ex. E; Lambert Aug. 3 Dep. at 73:4-11, 23-25; 74:2-25; 76:3-5.)

31.    The e-mail states that Ms. Mars and Mr. Ohler told Ms. Lambert that her unprofessional behavior hurt company morale and damaged McCann's credibility with its

vendors, who are heavily engaged in, and relied upon during the production process. (Mars Aff., Ex. E.)

32.    The e-mail states Ms. Mars and Mr. Ohler informed Ms. Lambert that she must take responsibility for the consistent negative reaction that people consistently have had towards her and that she needs to start acting more responsibly. (Id.)

33.    Ms. Lambert concedes that Mr. Ohler and Ms. Mars spoke with her regarding her inability to work with certain McCann's producers, and that they said they "were disappointed in the way they thought she had handled herself." (Lambert Aug. 3 Dep. at 73:4-11, 23-25; 74:2-25; 76:3-5.)

34.    Ms. Lambert expressed concern about the security of her job to Ms. Abbate because of the complaints made by producers about her.    (Abate Dep. at 65:4-9; Horowitz Aff., Ex. X; see also Lambert Aug. 3 Dep. at 102:13-103:4.)

35.    Ms. Lambert's difficulty working as a team player extended beyond working with McCann's producers; one of her previous copywriter partners, Jeff Taylor, refused to work with her because of her volatile behavior. (Mars Aff., ¶21.)

### Ms. Lambert's Request to Work With William Oberlander, McCann Executive Group Creative Director

36.    In or about the Summer of 2004, the Kohl's client requested that McCann assign a new team to handle its business. (Lambert Aug. 3, 2006 Dep. at 49:16-22; Mars Aff., ¶22.)

37.    Ms. Lambert, at the request of the Kohl's client, was removed from the Kohl's business. (Mars Aff., ¶22; see also Lambert Aug. 3 Dep. at 49:16-22.)

38.    Karen Abbate and Jagdish Prabhu, Ms. Lambert's supervisors on the Kohl's business, were assigned to the Johnson & Johnson account. (Mars Aff., ¶22.)

39.     Ms. Lambert informed Ms. Mars that she did not wish to work on the feminine product Stayfree manufactured by Johnson & Johnson that Ms. Abbate and Mr. Prabhu were handling.  (Lambert Aug. 3 Dep. at 57:8-11; 58:11-15; Lambert Sept. 11 Dep. at 10:5-17; Mars Aff., ¶22.)

37.     Ms. Lambert was "looking for new opportunities" at McCann instead of working for Ms. Abbate and Mr. Prabhu. (Lambert Aug. 3 Dep. at 57:15-16; Mars Aff., ¶23.)

38.     McCann hired William Oberlander as an Executive Group Creative Director, on or about December 1, 2004. (Mars Aff., ¶23.)

39.     Ms. Lambert requested that Ms. Mars permit her to work with Mr. Oberlander if he could use assistance. (Lambert Aug. 3 Dep. at 58:3-5; Mars Aff., ¶23.)

40.     McCann accommodated Ms. Lambert's request, and Ms. Mars and Ms. Thomas transferred her to Mr. Oberlander's group. (Mars Aff., ¶23.)

41.     Even though McCann had considered terminating Ms. Lambert's employment because of her inadequate performance, Ms. Mars and Ms. Thomas decided to give Ms. Lambert one final opportunity to prove her worth to the company. ((Mars Aff., ¶23.)

42.     Ms. Lambert's  first project in Mr. Oberlander's group was a creative pitch for the Intel account. (Lambert Aug. 3 Dep. at 64:2-4.)

43.     While Ms. Lambert was working on the Intel pitch, Ms. Mars emphasized the importance of the project to her and told her that she needed to significantly improve her performance and prove her creative abilities. (Mars Aff., ¶24; Lambert Aug. 3 Dep. at 144:22-145:2.)

44.     Ms. Lambert's work on the Intel pitch was unsatisfactory and she was unable to come up with any ideas good enough even to present to Intel.  (Oberlander Dep. at 70:22-71:4; 71:25-72:5; 86:18-22; Lambert Aug. 3 Dep. at 66:15-67:8; Mars Aff., ¶24.)

### Ms. Lambert's Termination

45.     On March 4, 2005, Ms. Thomas and Ms. Mars met with Ms. Lambert to inform her of her performance-based termination. (Mars Aff., ¶25, Ex. F.)

46.     At the March 4, 2005 meeting, Ms. Lambert informed Ms. Mars and Ms. Thomas that that she was pregnant.   (Lambert Aug 3 Dep. at 133:19-24; Mars Aff., Ex. F; see also Lambert Dep. at 133:2-135:23.)

47.     Ms. Lambert acknowledged that she had not informed Ms. Mars or Ms. Thomas of her pregnancy prior to that meeting. (Id.)

48.     At the termination meeting, Ms. Lambert requested that McCann permit her to work through her pregnancy, which was expected to last six more months, provide her with maternity leave benefits, and award her an enhanced severance because she was pregnant, suggesting that she should receive *more* favorable treatment than other McCann Creative Department employees *because* of her pregnancy. (Mars Aff., Ex. F; Lambert Sept. 11 Dep. at 30:8-31:5.)

49.     Ms. Mars informed Ms. Lambert that McCann would not give her preferential treatment because of her pregnancy. (Mars Aff. ¶26, Ex. F.)

### Ms. Lambert's Pregnancy

50.     In January 2005, Ms. Lambert informed her co-worker Amanda Riccarini, and her former supervisor, Ms. Abate, of her pregnancy.  (Lambert Aug. 3 Dep. at 110:9-111:11.)

51.     Ms. Ricciarini did not inform anyone at McCann of Ms. Lambert's pregnancy. (Ricciarini Dep. at 26:14-19.)

52.     Ms. Abbate did not inform anyone at McCann of Ms. Lambert's pregnancy. (Abbate Dep. at 123:22-124:16.)

53.     On January 28, 2005, Ms. Lambert sought and received information on about McCann's maternity leave policy from McCann's benefits department on a confidential basis. (Toolan Dep. at 23:22-24:17; 31:13-32:7; Horowitz Exs. T and U.)

54.     On January 28, 2005, Ms. Lambert spoke with Kaneeza Akbar, Benefits Specialist, and informed her of her pregnancy and that she wanted to start reading up on McCann's maternity leave policies and procedures. (Horowitz Aff., Ex. T.)

55.     On January 28, 2005, Ms. Akbar notified Anne Toolan, Benefits Manager, of her discussion with Lambert, and on that same day, Ms. Toolan provided Ms. Lambert with the information she requested. (Toolan Dep. at 23:22-24:17; 31:13-32:7; Horowitz Exs. T and U.)

56.     Neither Ms. Toolan nor Ms. Akbar shared Ms. Lambert's confidential information regarding her pregnancy with anyone at McCann. (Toolan Dep. at 22:5-24.)

57.     Neither Ms. Toolan nor Ms. Akbar played any role in the decision to terminate Lambert's employment. (Toolan Dep. at 22:22-23:8.)

58.     Ms. Toolan, as her notes indicate, did not learn of Ms. Lambert's termination until after it occurred, when Ms. Mars contacted Ms. Toolan by telephone and asked her to prepare a benefits termination letter for Ms. Lambert to advise her of her post-termination benefit rights. (Horowitz Aff., Ex. W.)

### McCann Does Not Discriminate
### Against Pregnant Woman; Many Pregnant Woman
### Have Sought and Taken Maternity Leave From McCann

59.     Many women have sought and taken maternity leave from McCann's Creative Department in the last several years, and returned to McCann (if they so chose) without any negative effects on their careers.   (Mars Aff., ¶¶29-31; Exs. G and H.)

60.     Twenty-two McCann Creative Department female employees took maternity leave between January 1, 2002 and December 31, 2005. (Mars Aff., ¶29, Ex. G.)

61.     Of the 22 employees who took maternity leave between January 1, 2002 and December 31, 2005, five voluntarily chose not to return from leave, three resigned for personal reasons, and thirteen returned to McCann's employ following maternity leave. (Mars (Mars Aff., ¶30, Ex. G.)

62.     McCann did not involuntarily terminate or take any other adverse action against any of the 22 McCann Creative Department female employees who took maternity leave between January 1, 2002 and December 31, 2005.  (Mars Aff. ¶¶29, 30, Ex. G.)

63.     In 2006, five McCann Creative Department female employees took maternity leave. (Mars Aff., ¶31, Ex. H.)

64.     Of the five McCann Creative Department female employees who took maternity leave in 2006, four have returned to McCann and one is presently on maternity leave. (Mars Aff., ¶31, Ex. H.)

65.     Of the five McCann Creative Department female employees took maternity leave in 2006, none were involuntarily terminated. (Mars Aff., ¶31, Ex. H.)

**Ms. Lambert Does Not Have Any Evidence**
**that McCann Discriminated Against Her Because of Her Pregnancy**

66.     Ms. Lambert does not have any knowledge that Ms. Mars or Ms. Thomas knew of her pregnancy when they informed her of her termination. (Lambert Aug. 3 Dep. at 133:2-135:23; 166:8-22; 167:11-169:15.)

67.     Ms. Lambert does not have any reason, other than her own subjective belief that *she* thinks her performance was satisfactory, for her belief that McCann discriminated against her because of her pregnancy. (Lambert Aug. 3 Dep. at 170:8-17.)

68.     Ms. Mars never said anything negative to Ms. Lambert about her pregnancy, or pregnant woman.  (Lambert Aug. 3 Dep. at 231:19-25.)

69.     Ms. Thomas never said anything negative to Ms. Lambert about her pregnancy, or pregnant woman.  (Lambert Aug. 3 Dep. at 232:11-19.)

70.     Mr. Oberlander never said anything negative to Ms. Lambert about her pregnancy, or pregnant woman.  (Lambert Aug. 3 Dep. at 232:20-233:3.)

71.     Ms. Abbate never said anything negative to Ms. Lambert about her pregnancy, or pregnant woman.  (Lambert Aug. 3 Dep. at 233:4-11.)

72.    Ms. Lambert is not aware of anyone at McCann making any negative comments about her pregnancy, or pregnancy in general.  (Lambert Aug. 3 Dep. at 233:12-19.)

Dated: New York, New York
        December 22, 2006

EPSTEIN BECKER & GREEN, P.C.

By: _____
      Kenneth J. Kelly (KK-4195)
      Aime Dempsey (AD-3104)
      Jennifer M. Horowitz (JH-3173)
      250 Park Avenue
      New York, New York  10177-0077
      (212) 351-4500
      Attorneys for Defendant
        McCann-Erickson, Inc.

## AFFIDAVIT OF SERVICE BY FEDEX

STATE OF NEW YORK     )
                             )   ss.:
COUNTY OF NEW YORK  )

        Christine Clowes, being duly sworn, says:

        I am not a party to this action, am over 18 years old and reside at Rockaway Park, NY. On December 22, 2006, I served a true copy of the attached Rule 56.1 by Federal Express overnight delivery to the following person at the address indicated below:

                Jeffrey M. Bernbach, Esq.
                Bernbach Law Firm PLLC
                Renaissance Corporate Center
                245 Main Street, 5th Fl.
                White Plains, NY  10601

                                    Christine Clowes

Sworn to before me this
22nd day of December, 2006

Notary Public
DAVID J. CLARK
Notary Public, State of New York
No. 02CL5080066
Qualified in New York County
Commission Expires October 23, 20 29

xxx