UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------

BETH LAMBERT,

                   Plaintiff,

-against-

MCCANN ERICKSON, a division of THE
INTERPUBLIC GROUP, INC.,

                   Defendant.

---------------------------------------------------------

```
┌─────────────────────────────────┐
│ USDC SDNY                       │
│ DOCUMENT                        │
│ ELECTRONICALLY FILED            │
│ DOC #:                          │
│ DATE FILED:    3/31/08          │
└─────────────────────────────────┘
```

05 Civ. 9825 (RJH)

**MEMORANDUM OPINION
AND ORDER**

Before the Court is defendant McCann Erickson's motion for summary judgment
on plaintiff Beth Lambert's claim that defendant terminated her employment based on her
pregnancy in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et
seq.* ("Title VII"), the New York State Human Rights Law, N.Y. Exec. Law §§ 296 *et
seq.* ("NYSHRL"), and the New York City Human Rights Law, N.Y.C. Admin. Code §
8-107 *et seq.* ("NYCHRL"). For the reasons stated below, the Court grants defendant's
motion for summary judgment.

## BACKGROUND

McCann Erickson ("McCann"), a large advertising agency, hired Beth Lambert
("Lambert") as a Senior Art Director in its Creative Department on October 30, 2000.
(Def.'s 56.1 Statement ¶¶ 1–2.) Lambert was promoted to the position of Creative
Director in November 2002. (Pl.'s 56.1 Statement ¶ 90.) McCann terminated Lambert's
employment on March 4, 2005; Lambert estimates that she was eight to ten weeks

1

pregnant at the time of her termination. (Def.'s 56.1 Statement ¶¶ 4, 6.) After Lambert was terminated, McCann hired a man to replace her. (Bernbach Decl. Ex. 39.) McCann claims that Lambert was fired because her performance and skills were deficient, and argues that the executives who made the termination decision— Senior Vice President and Director of Creative Services Sallie Mars and Chief Creative Officer Joyce Thomas —were unaware of Lambert's pregnancy until after they decided to fire her.[1] Moreover, defendant claims that it had considered firing Lambert well before she even became pregnant.

Lambert does not proffer any evidence that Mars and Thomas were in fact aware of her pregnancy but contends that her pregnancy must have played a role in her termination because her supervisors had often praised her and did not complain about her performance until after she began sharing the news that she was pregnant. In addition, Lambert claims that the supervisor to whom she was assigned in December 2004, William Oberlander, found out that she was pregnant in January 2005 and thereafter recommended to Mars and Thomas that she should be let go. Lambert argues that Oberlander had no reason (other than an alleged discriminatory intent) to recommend her termination. The facts relating to the parties' claims are set forth below and are undisputed except where noted.

---

[1] Lambert had been attempting to become pregnant for some time before December 2004, and had been undergoing in vitro fertilization for at least one year before she became pregnant. (Pl.'s 56.1 Statement ¶ 239.) Plaintiff does not argue that defendant began discriminating against her on account of her pregnancy (intended or actual) until after Lambert became pregnant. (*Cf.* Pl.'s Opp'n 22–24.) Likewise, while Lambert notes that she was unable to travel as a result of the in vitro process, she does not allege that defendant discriminated against her on this account. (*Cf.* Pl.'s Opp'n 15; Pl.'s 56.1 Statement ¶ 239.)

# I. Lambert's Employment Record at McCann before She Became Pregnant

Lambert's employment record at McCann is best described as checkered. She received glowing praise on certain projects and enjoyed the loyal support of certain of her supervisors. For instance, it is clear that Group Creative Director and Senior Vice President Karen Abbate, along with her partner Group Creative Director Jagdish Prabhu, thought highly of plaintiff's abilities. Abbate often praised Lambert's work (*see, e.g.*, Bernbach Decl. Ex. 10 at 25, 85, 86); Abbate and Prabhu twice tried to convince management not to fire Lambert (Bernbach Decl. Ex. 4 at 64, 93); and Abbate testified at her deposition that she believed that Lambert's performance and creative skills were "good." (*Id.* at 60–61.) Andrew Schirmer, a McCann Managing Director, praised work that Lambert had helped create (Bernbach Decl. Ex. 10 at 128), and sent Lambert and her partner, Meg Rogers, an encouraging note after a client rejected an ad they had prepared.[2] (*Id.* at 131.) Nina DiSesa, McCann's Chief Creative Officer before Joyce Thomas, praised Lambert's work at different points in April, June, and July of 2004. (Pl.'s 56.1 Statement ¶ 80.) Steve Ohler, an Executive Creative Director, congratulated Lambert when her work was recognized by a trade publication. (Bernbach Decl. Ex. 10 at 22).

The record also shows that in the period before December 2004, Lambert's supervisors often voiced concerns regarding her performance. In 2002 and 2003, Lambert was involved in three interpersonal disputes with co-workers requiring action by her supervisors. In the fall of 2004, McCann executives, including DiSesa, twice initiated efforts to have Lambert terminated because they believed that her salary

---

[2] Lambert argues that Schirmer pleaded for Lambert and her partner Meg Rogers to continue working for him. (Pl.'s 56.1 Statement ¶ 237). The e-mail from Schirmer that Lambert cites for this proposition indicates that Schirmer wanted Lambert and Rogers to finish a project that they had started for him, hut expresses nothing regarding Schirmer's desire for Lambert or Rogers to work with him in the future. (Bernbach Decl. Ex. 26.)

3

outstripped her value to the company. And, in a memo dated October 15, 2004, Mars detailed Ohler's serious concerns about plaintiffs' creative skills and her future role with McCann. All this occurred before Lambert became pregnant. Moreover, while it is undisputed that some of Lambert's supervisors praised her at times before she became pregnant (Pl.'s 56.1 Statement ¶¶ 76–82, 211), Lambert points to no evidence that anyone at McCann changed their opinions of her when they learned she became pregnant. [3] More importantly, there is no evidence that Mars or Thomas, who, along with William Oberlander, participated in Lambert's termination, thought highly of her work before she became pregnant.

## A. Lambert's Relationship with her Co-workers

Defendant has represented that Lambert was terminated, in part, because she was not a "team player." (Bernbach Decl. Ex. 16 at 2; Mars Aff. ¶¶ 17–21.) In an e-mail memorializing Lambert's termination on March 4, 2005, Sallie Mars noted complaints regarding Lambert's behavior toward her co-workers. (Mars Aff. Ex. F.) Lambert acknowledges that complaints were made about her but alleges that she was not at fault in the three disputes defendant has identified.

Sometime in 2002, Lambert's interpersonal problems with Cori Ranzer, a McCann assistant producer, required the intervention of Peter Friedman, McCann's Director of Broadcast Production. (Lambert Decl ¶ 5; Bernbach Decl. Ex. 2 ("Mars Tr.") at 58–59.) But, Lambert contends that Friedman concluded that Ranzer was at fault. (Lambert Decl. ¶ 5.) Lambert's partnership with Jeff Taylor also drew the attention of

---

[3] As noted above, Lambert claims that Oberlander could not have formed an opinion about her work before he learned that she was pregnant as he had recently arrived and had yet to work with her. Pl.'s Opp'n 23–24

4

her supervisors. It is undisputed that Lambert and Taylor's working relationship was often volatile, that it was punctuated by at least one public screaming match, and that it eventually "fractured." (Pl.'s 56.1 Statement ¶¶ 112, 114; Mars Tr. 35.) Karen Abbate recalled a meeting with Taylor in the fall of 2002 at which Taylor said that Lambert "was crazy and was Satan." (Bernbach Decl. Ex. 4 at 19, 79–80.) Predictably, Lambert and Taylor each complained about the performance and behavior of the other to Sallie Mars. (Mars Tr. 71, 73.) Mars testified that because she believed that Taylor was the more talented of the pair, she credited Taylor's complaints over Lambert's as she "[could] understand that the stronger partner would be frustrated with the weaker partner." (*Id.* 73.) Lambert was never disciplined for her dysfunctional working relationship with Taylor or Ranzer, and she received a promotion in November 2002 and a raise in June 2003.[4] (Pl.'s 56.1 Statement ¶¶ 90, 92, 116.) However, in the March 2005 termination e-mail, Mars noted that Lambert's involvement in verbal fights with Taylor and Ranzer prompted Mars to start recording complaints she received about Lambert as she felt that a "pattern [was] emerging." (Mars Aff. Ex. F.)

Among the complaints that Mars recorded are e-mails written by Mars, dated July 22, 2003, and September 4, 2003, that summarize two separate conversations that McCann supervisors had with Lambert regarding a single incident. (Mars Aff. Ex. F;

---

[4] Lambert's June 2003 raise, which increased her salary from $110,000 to $120,000, was the only pay increase Lambert received while she worked at McCann. (Bernbach Decl. Ex. 1 at 208–09 (Vol. I), Ex. 35 at 4.) Mars testified that raises were awarded to those who had done a "good job" and that a formula was applied to determine the amount and frequency of such raises. (Bernbach Decl. Ex. 2 at 22–23.) Mars estimated that, absent superlative work, employees in Lambert's position were eligible for a raise after eighteen to twenty-four months and that the average raise was approximately five percent. (*Id.* 23–24.) Thomas testified that for employees making under $150,000 she tries to award a raise every eighteen months, and that a five to ten percent raise would be given for longevity while a fifteen to twenty percent raise would be given on the basis of performance. (Bernbach Decl. Ex. 3 at 35–37.) Lambert's $10,000 increase in salary represented about a nine percent raise.

5

Bernbach Decl. Exs. 14, 17.) In the first conversation, on July 22, 2003, Mars and Steve Ohler—at that time, one of Lambert's supervisors—spoke to Lambert about her behavior toward McCann's production staff. (Def.'s 56.1 Statement ¶¶ 28–30.) According to the e-mail Mars wrote to memorialize the meeting for Lambert's personnel file, Peter Friedman had complained that Lambert was "not a team player," that she acted "like a princess, asking producers to work the schedule around her manicure appointments," and that she treated the producers "like they are her lackeys." (Bernbach Decl. Ex. 14.) According to Friedman, Lambert's behavior "cause[d] problems" and hurt McCann's credibility with its vendors. (Id.) In particular, Mr. Friedman had described one incident where Lambert asked for an elliptical exercise machine to be brought to her hotel room, and then Lambert "went nuts when the hotel wouldn't pay for it." (Id.) The e-mail notes that at the meeting, Lambert called the elliptical incident a "colossal misunderstanding." (Id.) Mars and Ohler advised Lambert that "she must take responsibility for the consistent reaction that people have had toward her" and that she should alert her supervisors to interpersonal problems as they occur "rather than taking her feelings out in a passive/aggressive way by treating the producers like fools." (Id.)

Lambert does not contest that the e-mail accurately reflects what was said at the July 22, 2003 meeting, or how her supervisors felt about her behavior at the time. (Pl.'s 56.1 Statement ¶¶ 30–33.) Rather, Lambert states that Mars and Ohler were wrong to find fault with her behavior and that Friedman later admitted that he had "jumped the gun" in raising the issue, and that he would "clear things up" with Mars and Ohler. (Pl.'s 56.1 Statement ¶¶ 28–30, 145–46.) Mars recorded her understanding of plaintiff's conversation with Friedman in a September 4, 2003 e-mail reporting that Friedman had

6

said that "he had a good long talk with [Lambert] and they are now on good terms." (Bernbach Decl. Ex. 17.) While a crisis was averted, it appears that Lambert's job had been at stake. One of the supervisors that supported Lambert, Karen Abbate, interceded on Lambert's behalf by emphasizing her hard work on a valuable account. (Bernbach Decl. Ex. 4 at 66.) According to Abbate, Steve Ohler had been considering terminating Lambert before Abbate and Prabhu's intercession "protected," or even "saved," Lambert's job. (Bernbach Decl. Ex. 4 at 64, 93.)[5]

## B.    Lambert's Value to McCann

By the fall of 2004, however, Lambert's position at McCann was again at risk, and, indeed a decision was made to let her go. In an e-mail on September 14, 2004, Nina DiSesa, then Chief Creative Officer, informed Mars and Thomas that she would discuss the "decision to let [Lambert] and [her partner] Meg [Rogers] go" with Karen Abbate and Jagdish Prabhu. (Bernbach Decl. Ex. 25.) In a follow-up e-mail, DiSesa reported that Abbate and Prabhu protested the decision, pointing to Lambert's good work for one of McCann's clients. (*Id.*) The e-mails demonstrate that DiSesa believed that Lambert and Rogers' salaries outstripped their value to McCann. (*Id.*) No action was taken, however, and shortly thereafter Joyce Thomas replaced DiSesa as Chief Creative Officer. (Pl.'s 56.1 Statement ¶ 230.) In October 2004, Thomas raised the possibility of firing Lambert

---

[5] There is additional evidence during this time period suggesting that Lambert's position had been in jeopardy. The Creative Department maintained an unofficial list of underperforming employees used for discussing cutbacks. (Mars Tr. 80–86; Bernbach Decl. Ex. 3 at 46–47, 58). According to Mars and Thomas, prior to her termination, Lambert had been on the termination list since 2002 or 2003. (Mars Tr. 85, Bernbach Decl. Ex. 3 at 55.) However, Lambert disputes defendant's evidence of Lambert's place on the termination lists, as defendant produced only one version of the list (Bernbach Decl. Ex. 24), and Lambert was given a raise and a promotion while on the list. (Pl.'s 56.1 Statement ¶¶ 211–12; ) On the latter point, Thomas testified that underperforming employees like Lambert were still given raises and promotions. (Bernbach Decl. Ex. 3 at 57–58.)

and Rogers anew, telling Abbate that the account they were working on did not justify their salaries. (*Id.*; Bernbach Decl. Ex. 4 at 98–99.) Again Abbate and Prabhu asked that Lambert's termination be reconsidered in light of Lambert's recent work, and again Abbate believed she had "saved" Lambert's job. (Bernbach Decl. Ex. 4 at 93–94.) Thomas later told Abbate that by splitting Rogers and Lambert's time between the pharmaceuticals group and Abbate and Prabhu's group, McCann could justify their salaries. (Pl.'s 56.1 Statement ¶ 232.)

While the rescinded decision to terminate Lambert in the Fall of 2004 was strongly influenced by financial considerations, the record indicates that Lambert's job performance was also at issue. Thus, in her e-mail recording her intention to terminate Lambert, DiSesa singled out Lambert and Rogers as a pair whose work could be better done by another team. (Bernbach Decl. Ex. 25.) This observation is consistent with Mars's testimony that in 2003 and 2004, DiSesa said that she believed that "Lambert was not conceptual, [that] she didn't have good ideas[, and that s]he didn't contribute enough to the pitches."[6] (Horowitz Aff. Ex. N at 54–56, Dec 21, 2006.) Similarly, Thomas testified that she was unsatisfied with Lambert's work for her in 2004 on a pitch for Verizon, and she complained about its poor quality to DiSesa.[7] (Horowitz Aff. Ex. C at 69, Mar. 2, 2007.) There is no testimony that these judgments, even if incorrectly held, were tainted by discriminatory intent.

---

[6] The Court understands this statement to be relevant not for the truth of the matter asserted but for its effect on the listener, Mars.

[7] Lambert tries to dispute Thomas's testimony that she believed that the Verizon work was poor by pointing to Steve Ohler's alleged perception that Lambert was not to blame for the pitch's poor reception by the client. (Pl.'s 56.1 Statement ¶¶ 166–70.) Whatever Ohler's perceptions, it is undisputed that in October 2004 Thomas believed that Lambert was expendable, and that this view was untainted by discriminatory intent.

8

### C.    The Unsent Corrective Action Memo of October 15, 2004

At the time that Lambert's termination was being considered in the Fall of 2004,

Sallie Mars drafted a Corrective Action Memo, dated October 15, 2004, on behalf of

herself and Steve Ohler, that is deeply critical of Lambert's work.  The memo states that

its authors had "reviewed [Lambert's] work on several occasions and it is not of the

caliber we expect from someone at her level." (Mars Aff. Ex. B.)  In particular, the

memo criticizes Lambert's work on a project for Verizon Wireless.  (*Id.*)  The memo

concludes that "given the past 5 years, a 30 day period of turn around will be insufficient

to change our opinion of [Lambert]." (*Id.*)  It is uncontroverted that the memo was never

delivered to Lambert, presumably reflecting that the decision to terminate Lambert at that

time was reversed.  As with other criticisms of her performance, Lambert contends that

the negative evaluations in the memo are false. (Pl.'s 56.1 Statement ¶ 15.)  Lambert also

states that the memo incorrectly asserts that her supervisors had previously spoken to her

about her performance.  (Lambert Decl. ¶¶ 6–7.)  As noted, however, plaintiff does not

proffer any evidence that any actions in 2004 by her supervisors were discriminatory.

She contests, however, the true date of the October 15, 2004 memo, implying that it was

actually written in March 2005 to create a false record justifying her termination.  (Pl.'s

Opp'n 30–31.)  This allegation is discussed *infra.*


### II.    Lambert' Pregnancy and her Transfer to Oberlander's Group

Having barely escaped termination in September and October of 2004, Lambert

was looking for new assignments. (Bernbach Decl. Ex. 1 at 57–58 (Vol. I).)  On

December 1, 2004, McCann hired William Oberlander as an Executive Group Creative

Director. (Pl.'s 56.1 Statement ¶ 38A.) Lambert asked to do some work with

Oberlander, and, by the end of December 2004 she learned that she had been transferred

to Oberlander's group.[8] (*Id.* ¶¶ 39A, 244.) At the end of December 2004, Lambert also

learned she was pregnant, though she did not begin informing her colleagues of her

pregnancy until January 2005. (*Id.* ¶ 260.) Lambert did not tell Mars, Thomas, or

Oberlander that she was pregnant until March 2005. She told Oberlander on March 3 at a

cocktail reception and Mars and Thomas on March 4 at the meeting in which she was

terminated. (Pl.'s 56.1 Statement ¶ 8(a), (e); Bernbach Decl. Ex. 1 at 129–31 (Vol. I),

Ex. 30.) However, Lambert claims that Oberlander knew she was pregnant by January

11, 2005 when it is undisputed that he made a preliminary recommendation to Thomas

that Lambert be let go. (Horowitz Aff. Ex. Y, Dec. 21, 2006.) Although Oberlander

could not recall a precise date, he remembered seeing a sonogram on the windowsill of

Lambert's office. (Pl.'s 56.1 Statement ¶¶ 264, 266; Bernbach Decl. Ex. 5 at 97.)

Oberlander recognized the printout as a sonogram based on seeing sonograms in

connection with the births of his own children. (Bernbach Decl. Ex. 5 at 97.) However

Oberlander did not ask Lambert about the sonogram, and she did not say anything about

it to him. (*Id.* at 97–98.) Although Lambert did not refer to this in her depositions, she

submitted an affidavit with her opposition to defendant's motion for summary judgment

stating that she only displayed the sonogram on her windowsill for a few days in early

January.[9] (Bernbach Decl. Ex. 5 at 101; Lambert Decl. ¶ 9.) Lambert claims that Mars

---

[8] Oberlander and Lambert had both worked at another advertising agency, though they had never worked together before Oberlander came to McCann. (Pl.'s 56.1 Statement ¶ 249.)

[9] Lambert did not testify that she remembered Oberlander seeing the sonogram on her window. (*See* Bernbach Decl. Ex. 1 at 153–56 (Vol. I).) Rather, Lambert testified that she believed that Oberlander saw sonograms lying on her desk on a separate occasion when the two were passing papers across Lambert's desk. (*Id.*) Lambert assumed that Oberlander had seen the sonograms lying on the desk. (*Id.* 154-55.)

10

and Thomas must have learned that Lambert was pregnant from others at McCann. (Pl.'s 56.1 Statement ¶ 8(a).) However, there is no evidence in the record to contradict their testimony that they were first informed of Lambert's pregnancy at the March 4 termination meeting. It is undisputed that two of the McCann employees that Lambert told—Karen Abbate and Amanda Ricciarini (not coincidentally the only two whose deposition testimony is before the Court)—did not tell anyone at McCann about Lambert's pregnancy. (Def.'s 56.1 Statement ¶¶ 51–52.) Abbate's testimony that she did not share news of Lambert's pregnancy with others at McCann is particularly important, as Lambert testified that she assumed that Mars learned of Lambert's pregnancy from Abbate. (Horowitz Aff. Ex. K 114–16, Dec. 21, 2006.)

The timing of Oberlander's viewing of the sonogram is relevant because it was on or about January 11, 2005 that he initially voiced the opinion that Lambert be replaced. In a January 11, 2005 e-mail, Joyce Thomas wrote to Oberlander, "[a]s we discussed last night, if [Lambert] does not have a role in your group, Sallie [Mars] and I will let her know that her time here is running out." (Horowitz Aff. Ex. Y, Dec. 21, 2006.) Oberlander responded that day that his "instinct [was] to let [Lambert] go and replace her w[ith] a conceptual yet visually design-y art director." (*Id.*) Although Oberlander had not yet worked with Lambert (Pl.'s 56.1 Statement ¶¶ 245, 247), he testified that Mars or

Oberlander did not recall the incident. (Bernbach Decl. Ex. 5 at 98, 100.) Lambert did not recall specifically when this second incident occurred, but believed that it occurred before meetings she had with Mars and Oberlander that took place in February 2005. (Horowitz Aff. Ex. K at 151–153, Dec. 21, 2006; Bernbach Decl. Ex. 1 at 154–56 (Vol. I) (Lambert's testimony that the incident occurred before she met with Oberlander about the Intel pitch), Bernbach Decl. Ex. 1 at 146–48 (Vol. I) (Lambert's testimony that she spoke to Oberlander about the Intel pitch within a few days of discussing the matter with Mars), Mars Tr. 141 (Mars's testimony that she spoke to Lambert about Intel in February 2005).) Assuming that Oberlander did see sonograms sitting on plaintiff's desk, there is no evidence suggesting that this would have occurred before he made the preliminary recommendation on January 11 that plaintiff should be let go.

Thomas had already told him that Lambert lacked the "conceptual ability to deliver great ideas." (Bernbach Decl. Ex. 5 at 33.) Additionally, Oberlander testified that Jeff Taylor, David Levy, and Ted Mendelson, three other members of his new group, resisted the idea of working with Lambert because "they thought that she was not a very good conceptualizer." (Bernbach Decl. Ex. 5 at 35.) According to Oberlander, the feedback he received from his new colleagues at McCann led him to believe that Lambert had not been able to move successfully from executing ads as a designer to conceiving ads as a creative director. (Bernbach Decl. Ex. 5 at 40.) Thus Oberlander testified that the preliminary recommendation in his January 11 e-mail was based on his impression that that Lambert was "damaged goods" and that she had a "terrible reputation." (Horowitz Aff. Ex. P at 42–44, 56–58, Dec. 21, 2006.)

Mars recalled telling Oberlander that Lambert was a "very design oriented art director" but she stated that she had not said "anything negative." (Mars Tr. 133–34.) Thomas did not recall making any specific criticisms of Lambert to Oberlander. (Bernbach Decl. Ex. 3 at 95.) Taylor, Levy and Mendelson did not testify, although the record indicates that Taylor held Lambert in extremely low regard.[10] (Bernbach Decl. Ex. 4 at 19, 79–80.) In any event, Lambert acknowledges that Oberlander told her directly in February 2005 that he did not want her in his group because he did not believe that she was a conceptual thinker. (Bernbach Aff, Ex. 1 at 148–50 (Vol. I).)

At the beginning of February, Oberlander assigned Lambert and others to develop a pitch for Intel. (Pl.'s 56.1 Statement ¶ 269.) Lambert was assigned to work with a relatively inexperienced copywriter named Aaron Spratt. (*Id.* ¶ 272.) Soon after,

---

[10] Likewise, Mendelson complained to Abbate about Lambert after working with her on the Intel project. (Horowitz Aff. Ex. D at 89, Mar. 2, 2007.)

12

Sallie Mars told Lambert that Oberlander did not want Lambert in his group because she was not "creative enough." (*Id.* ¶ 269.) The pitch for Intel, Mars told Lambert, would be a test of Lambert's creative abilities. (*Id.* ¶ 270.) If Lambert did not perform well, she would be let go. (*Id.*; Bernbach Decl. Ex. 1 at 146 (Vol. 1).) Lambert told Mars that she was upset with the situation and asked Mars how Oberlander could have already decided that Lambert was not good enough. (Bernbach Aff. Ex. 1 at 146–47 (Vol. 1).) Within a few days, Lambert confronted Oberlander. (*Id.* at 147–48.) In particular, she complained that she would be tested based on her work while paired with the more junior Spratt. (*Id.*) Oberlander advised Lambert to make the best of the situation. Lambert's work with Spratt was not selected for presentation to Intel. (Pl.'s 56.1 Statement ¶ 275.)

## III.   Lambert's Termination

Mars and Thomas terminated Lambert in a meeting on March 4, 2005. (Def.'s 56.1 Statement ¶ 4; Horowitz Aff. Ex. K at 135–37, Dec. 21, 2006.) Although Oberlander did not attend the meeting, as Mars testified, the decision to terminate Lambert was "a group decision" made by Mars, Thomas, and Oberlander. (Horowitz Aff. Ex. N at 38, Dec. 21, 2006.) Thomas, the most senior of the three, testified that she made the final decision. (Horowitz Aff. Ex. O at 39, Dec. 21, 2006.)

In an e-mail written the night of the termination meeting, Mars memorialized her understanding of what was said at the meeting and summarized the reasons for Lambert's termination. (Mars Aff. Ex. F at 1.) Mars reported that Thomas told Lambert that she was not a "go-to" person in the Creative Department and that Thomas had tried to find a place for her within the department but was unable to do so. (*Id.*) According to the e-mail, Lambert protested that her work had been well-received and complained that she

13

had not been given a fair opportunity to prove herself on the Intel pitch. (*Id.*) Plaintiff also revealed to Mars and Thomas that she was pregnant, and in a conversation with Mars later that day, asked to retain her position during the course of her pregnancy before taking maternity leave. (*Id.* at 2.) Mars told Lambert that she was not entitled to preferential treatment because she was pregnant; Mars explained that she had been able to change jobs when she was five months pregnant. (*Id.*) Plaintiff does not dispute Mars's account of the termination meeting, though her deposition testimony reveals a greater focus on her performance on the Intel pitch; plaintiff described the "sum and substance" of the meeting as follows: "The Intel pitch is over, you failed, you didn't produce what was expected of you. And now . . . we're letting you go as we told you we would . . . ." (Horowitz Aff. Ex. K at 161, Dec. 21, 2006.)

In the termination e-mail, Mars noted that she and Thomas had attempted to place plaintiff on projects run by Karen Abbate and Matt Lester, but that Abbate "was not thrilled with the prospect" and that Lester was not interested. (Mars Aff. Ex. F at 1.) Mars also wrote that all of the creative directors she had spoken with—Karen Abbate, Jagdish Prabhu, Steve Ohler, Bill Oberlander, Andrew Schirmer, Nina DiSesa and others—said that plaintiff was "not a great thinker, not conceptual" and that plaintiff was "more of a designer." (*Id.*) Additionally, Mars wrote that plaintiff had been on termination lists since 2003 and had been the subject of e-mail complaints and an official corrective action memo. (*Id.*)

Lambert argues that, contrary to Mars's claim that Lambert's supervisors doubted her conceptual skills, Nina DiSesa, Andrew Schirmer, Steve Ohler, and Karen Abbate praised Lambert's performance. While Lambert has presented evidence that DiSesa

praised Lambert's work at different points in April, June and July of 2004 (Pl.'s 56.1 Statement ¶ 80), as recited above, by September 14, 2004, DiSesa clearly believed that Lambert was expendable and that another team could do better work. (Bernbach Decl. Ex. 25.) Evidence of Ohler's positive assessment of plaintiff's work is similarly limited, in August 2003, Ohler congratulated Lambert when her work was recognized by a trade publication (Bernbach Decl. Ex. 10 at 22), and in April 2004, Rogers reported that Ohler did not blame Lambert and her team for Verizon's negative reaction to their pitch. (Bernbach Decl. Ex. 20.) Although she testified that she was concerned by plaintiff's interpersonal problems, Abbate did testify that she believed that Lambert's performance and creative skills were "good," and, as discussed above, did not hesitate to speak up for Lambert. (Bernbach Decl. Ex. 4 at 60–61.)

## DISCUSSION

### I.    Summary Judgment Standard

Under Federal Rule of Civil Procedure 56(c), summary judgment may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "The plain language of Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Distasio v. Perkin Elmer Corp.*, 157 F.3d 55, 61 (2d Cir.1998); *Conway v. Microsoft Corp.*, 414 F.

15

Supp. 2d 450, 458 (S.D.N.Y. 2006). A party moving for summary judgment may discharge its burden "by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325.

A fact is considered "material" for purposes of Rule 56 if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Whether a material issue is "genuine" depends on whether the evidence is of a type that would permit a reasonable jury to return a verdict in favor of the nonmoving party. *Mitchell v. Shane*, 350 F.3d 39, 47 (2d Cir. 2003). In showing that a genuine issue of material fact exists, the nonmoving party may not rely on "[t]he mere existence of a scintilla of evidence" to support its position but must instead proffer "evidence on which the jury could reasonably find for the [plaintiff]." *Dawson v. County of Westchester*, 373 F.3d 265, 272 (2d Cir. 2004) (citing *Anderson*, 477 U.S. at 252). Although "[i]t is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases," *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001), it is "sparingly used where intent and state of mind are at issue because . . . careful scrutiny of the factual allegations may reveal circumstantial evidence to support the required inference of discrimination." *Graham v. Long Island R.R.*, 230 F.3d 34, 38 (2d Cir. 2000) (citations omitted).

## II.    Title VII

Title VII provides in relevant part that "[i]it shall be an unlawful employment practice for an employer . . . to discharge any individual . . . because of such individual's

16

... sex." 42 U.S.C. § 2000e-2(a)(1). Employment discrimination claims brought under the NYSHRL and NYCHRL are evaluated under the same standards that govern Title VII. *Weinstock v. Columbia University*, 224 F.3d 33, 42 n.1 (2d Cir. 2000). Here, plaintiff alleges that McCann terminated her employment because she is a woman, and because she was pregnant.[11] Pregnancy discrimination claims are analyzed using the burden shifting framework of *McDonnell Douglas Corp v. Green*, 411 U.S. 792, 802–05 (1973). *See, e.g., Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400–01 (2d Cir. 1998). Under *McDonnell Douglas*, plaintiff must first establish a prima facie case of discrimination. Plaintiff may do so "by showing that: (1) she is a member of a protected class; (2) she satisfactorily performed the duties required by the position; (3) she was discharged; and (4) her position remained open and was ultimately filled by a non-pregnant employee." *Kerzer*, 156 F.3d at 401 (internal quotations omitted). A plaintiff may also establish the fourth element by "demonstrating that the discharge occurred in circumstances giving rise to an inference of unlawful discrimination." *Id.* "A plaintiff's burden to establish a prima facie case of discrimination is de minimis." *Id.*

Plaintiff must also be able to point to some admissible evidence from which a rational jury could infer that the employer knew that the plaintiff was pregnant. *See Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 82–84 (2d Cir. 2005) ("We . . . join our sister circuits in concluding that a defendant's discriminatory intent cannot be inferred, even at the prima facie stage, from circumstances unknown to the defendant."). Plaintiff must "do more than produce evidence that *someone* at [the defendant] knew [plaintiff was

---

[11] Title VII's definition of "because of sex" includes "because of or on the basis of pregnancy, childbirth or, or related medical conditions." 42 U.S.C. § 2000e(k); *see also Saks v. Franklin Covey Co.*, 316 F.3d 337, 343 (2d Cir. 2003).

17

pregnant]. She was obliged to offer evidence indicating that persons who actually participated in her termination decision had such knowledge." *Woodman*, 411 F.3d at 87; *see also Stainkamp v. Changes Intern. of Fort Walton Beach, Inc.* 373 F. Supp. 2d 163, 167–68 (E.D.N.Y. 2005) (holding that plaintiff had not made out prima facie case of pregnancy discrimination where she submitted no evidence to challenge testimony of executive who made decision to terminate plaintiff that he learned of plaintiff's pregnancy after he decided to fire her).[12]

If the plaintiff establishes a prima facie case, defendant bears a burden "to articulate a legitimate, clear, specific, and non-discriminatory reason for discharging the employee." *Id.* Defendant's burden is "one of production, not persuasion; it can involve no credibility assessment." *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 142 (2000) (internal quotation marks omitted). Once met, defendant's burden—along with the rest of *McDonnell Douglass* framework—disappears. *Id.* At all times, the plaintiff retains "the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against her on account of her pregnancy." *Quaratino v. Tiffany & Co.*, 71

---

[12] *Woodman* and *Stainkamp* are in tension with the Second Circuit's decision in *Gordon v. New York City Board. of Education*, 232 F.3d 111, 116 (2d Cir. 2000), upon which this Court relied in *Perkins v. Memorial Sloane-Kettering Cancer Center*, No. 02 Civ. 6943 (RJH), 2005 U.S. Dist. LEXIS 22541, at *53 (S.D.N.Y. Sept. 30, 2005). Essentially, under *Woodman* and *Stainkamp*, a plaintiff must offer evidence that a decision-maker was aware of her protected *status* to establish a prima facie case of discrimination. *Woodman*, 411 F.3d at 87; 373 F. Supp. 2d at 167–68. But, under *Gordon* and *Perkins*, plaintiff need only point to evidence of general corporate knowledge of her protected *activity*. *See Gordon*, 232 F.3d at 116; *Perkins*, 2005 U.S. Dist. LEXIS 22541, at *53. This difference may reflect the different standard for stating a prima facie case in protected activity cases: plaintiff must show that "(1) she was engaged in an activity protected under Title VII; (2) the employer was aware of plaintiff's participation in the protected activity; (3) the employer took adverse action against plaintiff; and (4) a causal connection existed between plaintiff's protected activity and the adverse action taken by the employer." *Gordon*, 232 F.3d at 116. Evidence of general corporate knowledge is sufficient to meet the second element, *see id.*, while "the lack of knowledge on the part of particular *individual agents* is admissible as some evidence of a lack of a causal connection," *see id.* at 117 (emphasis added). Whatever the rationale for the different prima facie showing for discrimination claims based on a protected activity as opposed to a protected status, *Woodman* clearly controls in protected status cases like this one. In any event, because Oberlander, a McCann decision-maker, was arguably aware of plaintiff's pregnancy at the time she was terminated, the *Woodman* standard is met. *See infra.*

F.3d 58, 64 (2d Cir. 1995). To satisfy this burden, "the plaintiff may attempt to establish that [she] was the victim of intentional discrimination by showing that the employer's proffered explanation is unworthy of credence." *Reeves*, 530 U.S. at 143 (internal quotations omitted). "In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose." *Id.* at 147. And, to defeat summary judgment, the plaintiff need only show that the "prohibited factor was at least of the motivating factors." *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 78 (2d Cir. 2001) (internal quotation marks omitted).

However, a "plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false," will not always be adequate to defeat a motion for summary judgment. *Reeves*, 530 U.S. at 148; *see also Schnabel v. Abramson*, 232 F.3d 83, 89 (2d Cir. 2000) ("*Reeves* applies with equal force on a motion for summary judgment."). Whether summary judgment is appropriate depends on a number of factors, including the "strength of the plaintiff's prima facie case, [and] the probative value of the proof that the employer's explanation is false." *Reeves*, 530 U.S. at 148–49. An employer is entitled to summary judgment where there is only a "weak issue of fact as to whether the employer's reason was untrue and there [is] abundant and uncontroverted independent evidence that no discrimination had occurred." *Id.* at 148. The Second Circuit has instructed that *Reeves* "clearly mandates a case-by-case approach, with a court examining the entire record to determine whether the plaintiff could satisfy his 'ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff.'" *Schnabel*, 232 F.3d at 90 (quoting *Reeves*, 147 U.S. at 143).

19

## III. Application

Plaintiff has produced evidence sufficient to meet the four elements required to make out a prima facie case of pregnancy discrimination: (1) she was pregnant; (2) she satisfactorily performed her duties as Creative Director; (3) she was discharged; and (4) she was terminated after she became pregnant, and her position was ultimately filled by a non-pregnant employee. Whether plaintiff has submitted sufficient evidence of a McCann's knowledge of her pregnancy is a somewhat closer question. It is undisputed that Oberlander saw sonograms in Lambert's office. Though Oberlander testified that he could not tell what the sonograms depicted, he recognized them from his experience with his own children. There is also some evidence in the form of Lambert's affidavit that the sonograms were on her windowsill for a "handful of days" "in early January." (Lambert Decl. ¶ 9, Jan. 24, 2007.) While circumstantial (and relatively weak), this evidence raises a genuine issue of fact as to Oberlander's knowledge of plaintiff's pregnancy, as a jury could infer that Oberlander surmised that the sonograms indicated that Lambert (and not a friend or family member) was pregnant, and further, that this event took place before he made his initial recommendation on January 11 that plaintiff be let go.

Therefore, defendant was required to submit a legitimate non-discriminatory reason for Lambert's termination. Here defendant met its burden of production by putting forth evidence that Lambert was fired for poor performance. *See, e.g., Saulpaugh v. Monroe Cmty. Hosp.*, 4 F.3d 134, 141 (2d Cir. 1993) (accepting poor performance as a legitimate non-discriminatory reason for termination). Thus, to avoid summary judgment, Lambert must show that there exists some genuine issue of material fact as to whether her pregnancy was a motivating factor in her termination. To meet this burden,

plaintiff's papers point to the timing of termination decision (Pl.'s Opp'n 24–25), the alleged absence of non-discriminatory reasons for the termination (*Id.* at 25), the circumstances surrounding the Intel pitch, which plaintiff argues was a sham (*Id.* at 26), and evidence suggesting that plaintiff's performance was better than defendant admits. (*Id.* at 27–31).

In assessing whether there remain genuine issues of material fact, one uncontroverted fact stands out: Mars and Thomas did not know that Lambert was pregnant until after they fired her. There is simply no evidence in the record to support an inference that Mars or Thomas knew plaintiff was pregnant before the termination meeting. Plaintiff never told Mars or Thomas, and plaintiff's conclusory assumption that Abbate would spread the news is rebutted by Abbate's testimony to the contrary. *See Geraci v. Moody-Tottrup, Int'l, Inc.*, 82 F.3d 578, 582 (3d Cir. 1996) (finding no genuine issue of fact as to employer's knowledge where plaintiff told six out of twenty co-workers that she was pregnant because the "managers filed [unrebutted] declarations disclaiming knowledge," and the only deposed co-worker who knew plaintiff was pregnant testified that he had not told management). Of course, Mars and Thomas's ignorance of Lambert's pregnancy does not end the Court's inquiry as Lambert need not offer evidence indicating that everyone who participated in her termination knew she was pregnant, just that any of them did. *See Woodman*, 411 F.3d at 87. For "even absent evidence of illegitimate bias on the part of the ultimate *decision maker*," the impermissible bias of an individual may "taint the ultimate employment *decision*," (for which the corporate defendant is responsible) if that biased individual's recommendations or actions proximately lead to the ultimate decision. *Back v. Hastings on Hudson Union*

*Free Sch. District*, 365 F.3d 107, 125–26 & n.17 (2d Cir. 2004) (quoting *Bickerstaff v. Vassar College*, 196 F.3d 435, 450 (2d Cir. 1999)) (emphasis added).

But, it bears emphasis that this taint derives from the impact that the bias-motivated actions or recommendations have on the employment *decision*. It does not arise because one decision-maker's unspoken bias (or here, the knowledge precedent to such bias) may be imputed to all. *See Woodman*, 411 F.3d at 87–88 (holding that plaintiff's proffer of evidence that some of defendant's employees knew of her protected status did not permit an inference that those employees who actually participated in her termination had such knowledge). Thus, Mars and Thomas's decisions could only have been discriminatory to the extent that they relied on recommendations or assessments that were motivated by improper consideration of Lambert's pregnancy. This means that none of Mars and Thomas's independent pre-termination actions or perceptions, however unfair or erroneous, can give rise to an inference that either was motivated by Lambert's pregnancy. Plaintiff may be right that Mars and Thomas treated her badly by discounting the quality of her prior work, relying on the snap judgment of a supervisor who had barely worked with her, and treating the Intel pitch as her last chance to save her job. However wise or foolish, these decisions could not have been motivated by Lambert's pregnancy. *Cf. Norton v. Sam's Club*, 145 F.3d 114, 120 (2d Cir. 1998) ("[T]he ADEA does not make employers liable for doing stupid or even wicked things; it makes them liable for *discriminating*, for firing people on account of their age.")

That Mars and Thomas did not know about plaintiff's pregnancy until the termination meeting makes plaintiff's argument that the October 15, 2004 Corrective Action Memo was fraudulently backdated particularly implausible. An allegation of

22

fabrication of the memo would only make sense if (1) Oberlander's assessments were motivated by discriminatory animus and thereby tainted his recommendation to Mars and Thomas; (2) Mars and Thomas at some point discovered Oberlander's discriminatory motive; and (3) Mars then fabricated the memo detailing complaints by Mars and Ohler in October 2004 to cover up discriminatory assessments by Oberlander in January and February 2005. Moreover, this supposed fabrication scheme would have had to have been hatched very quickly, as Mars mentions the corrective action memo in an e-mail she wrote just hours after Lambert's revelation of her pregnancy at the termination meeting. There is nothing in the record save pure speculation to support this improbable sequence of events.

Plaintiff argues that there is circumstantial evidence that the memo was fabricated because (1) it was not given to her or discussed with her and (2) the memo contains allegedly false statements regarding the quality of her work and whether her previous performance had been discussed wither her. But alleged inaccuracies do not establish when the memo was created nor obviate the fact that it is dated at precisely the same time that both parties agree that plaintiff's termination was under active discussion. It is beyond dispute that McCann decided internally to fire Lambert in October 2004. It is also undisputed that Mars and Thomas reversed that decision and instead made an effort to find new work for her, including assigning her in December 2004 to Oberlander's team. Taken together, the evidence in the record would not permit a reasonable inference that the memo was fabricated, much less that the fabrication was intended by Mars to obscure discriminatory recommendations made by Oberlander.

23

The question then is whether the evidence supports an inference that pregnancy motivated Oberlander's negative assessment of Lambert, and that this assessment was unwittingly relied upon by Mars and Thomas. It should first be emphasized that plaintiff presents no evidence that Oberlander's treatment or assessment of her was motivated by her *pregnancy*. Oberlander never said anything negative about plaintiff's pregnancy or anyone else's. (Def.'s 56.1 Statement ¶ 70.); *cf. Abdu-Brisson v. Delta Air Lines*, 239 F.3d 456, 468 (2d Cir. 2001) (relevance of discriminatory remarks). Similarly, plaintiff, concedes that she has presented no evidence Oberlander treated other pregnant employees poorly. (Pl.'s Opp'n 32–33.); *cf.Chertkova*, 92 F.3d 81, 92–93 (2d Cir. 1996) (relevance of treatment of other members of protected class). Rather, plaintiff concludes that "something occurred in the short intervening period between plaintiff's arrival in Oberlander's group and her having been targeted by him for dismissal [on January 11, 2005] . . .[because] the only matter of significance occurring for him within that span in regard to plaintiff was his discovery of her pregnancy." (Pl.'s Opp'n 23–24.) As noted, the evidence suggesting that Oberlander knew that Lambert was pregnant before he suggested that she be fired in the January 11, 2005 e-mail is exceedingly thin. After learning that Oberlander had noticed a sonogram on her windowsill, plaintiff submitted an affidavit accompanying her opposition papers asserting that she only had a sonogram on her windowsill for the first few days of January. (Lambert Decl. ¶ 9.) Nevertheless, from this evidence, a jury could conceivably infer that Oberlander learned that plaintiff was pregnant before writing the January 11 e-mail. However, mere knowledge of plaintiff's protected status is not sufficient to raise a triable issue of discriminatory intent where there is no evidence that the proffered reason for Oberlander's recommendation

was false or pretextual. Plaintiff attempts to show pretext by arguing that her job performance was, in fact, good. But Oberlander never testified that he worked with Lambert and found her performance wanting before he formed his preliminary opinion that she be let go. To the contrary, his testimony was his belief that she should be replaced with a more conceptual art director was based solely on the views of others. Mars testified that she told Oberlander that plaintiff was design-oriented, and Oberlander testified that plaintiff's co-workers told him that she was not a conceptual thinker. Most importantly, plaintiff acknowledges that Oberlander actually told her, before the Intel project, that he did not believe she was sufficiently creative. Notwithstanding the heated rhetoric in plaintiff's papers, whether her past performance was *actually* subpar is irrelevant to Oberlander's state of mind in January 2005 as he did not form his initial opinion that plaintiff should be replaced based on her actual performance but merely on her reputation and on the comments of other employees.[13] While Lambert might find this process unfair, it is well-established that Title VII does not protect employees from bad decision-making. *See, e.g., Alfano v. Costello*, 294 F.3d 365, 377 (2d Cir. 2002) ("[F]ederal courts are not in the business of adjudging whether employment decisions are prudent or fair. Instead our sole concern is whether unlawful discriminatory animus motivates a challenged employment decision.") (internal quotation marks omitted).

---

[13] At one point in his deposition, Oberlander stated that he was evaluating plaintiff on "a clean slate" and with a "blank mind." (Bernbach Decl. Ex. 5 at 38.) Plaintiff argues that this testimony was false (and is evidence of discriminatory intent) because it conflicts with Oberlander's testimony that he formed his initial opinion that plaintiff should be replaced on the basis of her reputation. However, there is no inconsistency in Oberlander's testimony: he formed a negative opinion of plaintiff before having worked with her, but agreed with Mars that plaintiff's work would be tested on the Intel pitch. (Bernbach Decl. Ex. 5 at 38–40, 42–43.) Plaintiff's work was not selected for the pitch to Intel and she offers no evidence that this was discriminatory or colored in any way by Oberlander's negative view of her reputation. Of course, even if plaintiff was judged unfairly on the Intel pitch, this would not provide a basis for relief. *See Alfano v. Costello*, 294 F.3d 365, 377 (2d Cir. 2002).

25

Similarly, with respect to the one project that Oberlander did directly supervise, Intel, plaintiff does not dispute that she did not present a winning pitch. (Pl.'s Opp'n 26.) Indeed, given Mars and Thomas's readiness to fire her, plaintiff cannot plausibly contend that a negative assessment of her work on Intel was so inconsistent with her past reviews that—standing alone—it would support an inference of discrimination by Oberlander.

In sum, plaintiff's only evidence that Oberlander's stated reasons for recommending plaintiff's termination—her bad reputation and her unimpressive work on the Intel pitch—are pretext for unlawful pregnancy discrimination is the fact that plaintiff was pregnant and that she was treated unfairly. This is plainly insufficient. *See Lizardo v. Denny's Inc.*, 270 F.3d 94, 104 (2d Cir. 2001) ("Plaintiffs have done little more than cite to their mistreatment and ask the court to conclude that it must have been related to their race."); *Sookdeo-Ruiz v. GCI Group*, No. 00 Civ. 03517 (HB), 2001 WL 121942, at *3 (S.D.N.Y. 2001) ("Plaintiff argues that defendant's decision to put her on probation was a sudden and disproportionate response to the concerns expressed in her evaluations and by her superiors. However she has failed to offer a shred of evidence that defendant had a discriminatory motive.") *aff'd* 31 Fed. Appx. 17 (2d Cir. 2002).

As noted above, in *Reeves*, the Supreme Court posited that an "employer would be entitled to judgment as a matter of law . . . if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred." *Reeves*, 530 U.S. at 148. This is such a case. Here, the evidence before the Court creates, at best, an extremely weak issue of fact as to the truth of Oberlander's reasons for suggesting her termination; yet there can be no question that Mars and Thomas, who terminated plaintiff

only after consulting other McCann supervisors, and who were unaware that plaintiff was pregnant, acted without discriminatory intent. *See Norton v. Sam's Club*, 145 F.3d 114, 119 (2d Cir. 1998) ("Norton's very weak prima facie case, combined with an at best highly dubious showing of pretext, that in itself docs not implicate discrimination, is simply not enough to support the jury's conclusion that he was fired because of his age.") From the foregoing, a reasonable fact finder could not infer that McCann terminated plaintiff on account of her pregnancy.

## CONCLUSION

For the reasons stated above, defendant's motion for summary judgment [15] is granted. The Clerk of the Court is requested to close this case.

SO ORDERED.

Dated: New York, New York
March 31, 2008

Richard J. Holwell
United States District Judge